Good to be with you all. Our next case is Sorto-Guzman v. Attorney General Garland. Mr. McKinney, good to have you with us, sir. Good morning, Your Honor, and good morning to all of you in counsel. May it please the Court, my name is Jeremy McKinney of the North Carolina Bar, and I'm arguing on behalf of Petitioner Zoila Sorto-Guzman and her minor child. Now, I'm arguing this case. This case was actually filed and briefed by my former associate, Jeffrey Whitteson. But you're the only one we have here, so you're on the spot seat. Absolutely. As I was preparing for the argument today, I was struck by one phrase in Attorney Whitteson's request for oral argument, which is usually not noteworthy, right? A request for oral argument, but I think it sums up this case in one sentence. And what he wrote was, while the dispositive issues raised in this appeal have been recently and authoritatively decided, the BIA is not recognizing it as such. That is truth. They don't like the fact that death penalties, death threats are looked unfavorably by us. I absolutely agree with that statement, Judge King. But if we think about just the briefing itself, cited almost two decades worth of cases from this court, published decisions that said a credible threat of death constitutes persecution. Well, let's make sure the record is clear. Did the I.J. find that Soto received a credible death threat based on her religion? What he said was, this is at AR 51. You can take that mask off if you'd like. Oh, I'm sorry. Thank you, Judge King. At AR 51, the judge said during this encounter, the Mara 18 gang members told the respondent that if they found her attending church again or wearing the cross again, they would kill her. That's the judge's finding, right? He found the respondent to be credible, and he gave her testimony, quote, full evidentiary weight. So that's the fact of the case? That is the fact of the case. As to the first threat? As to the first threat. Now, if the BIA... But they say, well, he didn't kill her. In their brief, they're saying, well, he didn't follow up on it. Well, it was conditional, as I read it, if she couldn't go back to church and she couldn't wear the cross. Correct, Your Honor. And she didn't. And she didn't. So she fulfilled the condition based on the record here. This phrase is not quoted often in the Fourth Circuit, but is quoted widely elsewhere. And that is a version of persecution, where the persecutor seeks to overcome a belief or characteristic of the asylum seeker. It's exactly what we have here. That's exactly what we have here. You have a threat of death used to overcome a belief, a value system, mind you, of the asylum seeker. The fact that the persecutors did not go through with it is fortuitous. We wouldn't be here right now because my client would be dead. But what we did see was continued violence between the exact same persecutors and the exact same asylum seeker. How many threats were there? There were at least three. Three? But only one was directly tied to going to church or wearing the cross. Correct. That was the first one. Correct. And the other two were within 60 days. They're about every month. Also correct. So what happened, you had the first incident in front of the church, directly tied? And they say the second two are not relevant. They say, I'm talking about the Attorney General. Attorney General says they're not relevant. The next two are not relevant because they didn't say anything about religion in the second two. But they were death threats. Correct. Did you, I don't know how much of a criminal lawyer you are, but have you ever heard of Rule 404B of the evidence rule? I'm going to have to admit my ignorance, Judge King. It's what we call similar act evidence. Right. In the criminal rule, you can prove a pattern of conduct or intent or that kind of thing, and they do it in drug cases a lot. They charge one count of transaction down on the corner, and they'll prove six or eight that occurred every day around it. And so the pattern. What we also see, Judge. So that's kind of, this reminded me of 404B evidence. And we have said that 404B evidence is inclusive. It's part of the proof, like the race just die of the case. In criminal cases. I'm not saying it has anything to do with this, but this reminded me of the 404B rule. Because we get a lot of these criminal cases where the government's all the time charging one count and proving six or eight incidents to prove the one. Correct. That's attorney generals, people. They're doing it. While I think that the incident in front of the church, what we would call the initial encounter, checks all the boxes in and of itself, by itself. What happened later informs that incident, and it actually provides a bit of steel to the threat. It provides credibility to the death threat. Well, as a matter of fact, in 2018, in a case, the court held the threat of death alone constitutes persecution. And an applicant is not required to prove additionally, prove long-term physical and mental harm to establish past persecution. So the first incident would, in and of itself, be enough. From your view. That is exactly my view. And it is a point that this court continues to make. During briefing, this court said it again in Bedoya v. Barr. After briefing in this case, between briefing and today's oral argument, this court said it two more times. In Arredo-Darris v. Wilkinson and Portillo-Flores v. Garland on Baum. The point has been repeated over and over again. Do they want us, the government, to change the law with this panel? Is that the way you read what they're arguing in this case? The way that I read the department's brief was that they want the court to perhaps engage in some kind of more extensive test of what constitutes a credible death threat. Whether it was written versus oral. Well, they get that one. That's a Bedoya case. Correct. I think I was involved in that. And I said something about the written threats. Easier to prove if it's a written threat, I guess. It's easier to prove, but the board at that point, the government, was arguing that it wasn't as immediate. Because there was a detachment there. It was a text message. It wasn't a threat made orally or in person where you had that threat of imminent danger, imminent violence. And what the panel made clear was that that's not necessary. That is not necessary. That written forms can be as menacing as an oral threat. Now, the government here seeks to or suggests that maybe that should be a test on the strength, whether it was written versus oral. But that was not the point we would contend of the panel's decision. It was actually the opposite, just pointing out that a written threat could be as powerful as an oral threat. As a general proposition, one panel of this court, under our rules of precedent, can't change the rulings of earlier panels, or certainly not of the in-bank court. Only the spring court or the in-bank court can change earlier panel rulings. I mean, when the party doesn't like what we have said in the earlier cases, which might be controlling precedent, they have to get the in-bank court to change it. They could be setting that issue up for in-bank review or try to get it up there. Yes, but I would still view it as not going back to the Rule 4B, I believe you said, Judge King. I said 404B. 404B, I apologize. I may have said the criminal rules, it's the rules of evidence. Rules of evidence. 404B, rules of evidence. Which, of course, famously don't apply to this court, thus my unfamiliarity. But it was really the immigration judges, and again, this decision was fully affirmed and adopted by the BIA. They only underscored where they agreed with the immigration judge, but they did not add any additional reasoning. The decoupling of the first encounter between the asylum seeker and the persecutor from the rest of their encounters is an equally egregious error. The immigration judge analyzed the threat, which was a threat of death if she wore the cross or went to church again, along with what the immigration judge characterized as, quote, just kicking her, separately from the other violent incidents. But what we see here is a pattern of escalation, starting with outside of the church, going into another encounter on the street, and then escalating to a home invasion. When we look at many gang-related cases, they often involve mixed aims, forced recruitment, forced participation in a criminal enterprise like drug smuggling, forced sexual servitude. But here, what is the persecutor seeking to overcome? Is it kinship ties? Is it political opinion? Here, fortunately, we have it stated plainly. Plainly, it was religion. Eliminate the value system and control the individual. The IJ's finding that the threat did not rise to persecution because it did not come to fruition is, well, in addition to being insulting, I find it rather absurd, again, because my client would not be alive. The immigration judge also said it was not an imminent threat because she was never threatened based on her affiliation with the Catholic Church thereafter. Again, not necessary under the case law of this circuit, but also legal error because the rest of the facts inform what happened during that first encounter. If we go back to the Tyro case versus Whitaker that Judge Floyd mentioned earlier, you had death threats at a public gathering, a single event, a single event mind you, and then subsequently there was a violent home invasion. Well, judges, that's exactly what happened here. You have a death threat that was made at a public gathering followed by a violent home invasion. It all informs the same thing. It informs the credibility and the reality of this death threat made by a notorious criminal enterprise in the middle of one of the murder cases. What's this thing called, Mara 18 or something? Mara 18, yes. Are we supposed to understand that that's a notorious criminal enterprise? Nobody bothered to explain that to us in these papers. Yes. And there's another thing called 13? MS-13. MS-13, it's supposed to be one too. Are there others lurking around in these? The 18th Street and MS-13 are the two most prominent gangs in El Salvador. And we're supposed to know that by intuition or something? I believe that in the administrative record at the immigration judge level that previous counsel put in country condition documents that discussed this. Maybe I didn't get enough detail in that record. I'm not up to date on a lot of that kind of thing. And what you hear typically because one gang typically controls a particular area, you often hear asylum seekers not be helpful on this point because they will simply say the gang, because the gang is one entity. That's not the case here. The asylum seeker knew exactly which gang it was and actually knew at least one of the gang members personally from childhood. As I recall the record right, and I thought it was fascinating, after the third threat, like Valentine's Day or something, she left the country with her son the next day, February 15th. And had to sell the cows to get money. After attempting to do the right thing and report the fact that she had been victimized to the police, the police basically did nothing at that point. And then she was threatened for going to the police. That was when she knew she would not receive any protection in her home country and had to flee. What is necessary to establish religion as a central reason for an attack? You mentioned, alluded to the fact that maybe just that one incident alone might have been enough. And yet the cases you cite, there has not been one case that I found where it was just one incident. There were multiple incidents of threats there. So when we're faced with one incident, I don't think we've said per se that's enough. But are these other incidents necessary in order to conclude there's a credible threat that arises from religion? Judge Wynn, I think it would depend on the record of each case, because I don't think if you look at a death threat in isolation without any other context, I don't think that the fact finder would have sufficient evidence to figure out whether it was credible or not. I think arguably the asylum seeker would not satisfy her burden of proof under that circumstance. So it is up to the asylum seeker who has the burden of proof to demonstrate the context of that death threat and establish its credibility. So there could only be one death threat. The threat of death constitutes persecution in the words of this court. But it can't be devoid of context. What the immigration judge's chief error here was robbing this incident of its context. In terms of religion here, there's a direct tie because that's literally the words that were spoken by the gang member that issued the death threat. If they found her attending church again or wearing the cross again, they would kill her. Thank you very much, sir. Thank you. You have reserved a few minutes. Mr. Fiorino. I'm sorry, sir. Good to have you with us. Can you represent Attorney General Garland? Yes, your honor. Paul Fiorino for the respondent. To address a point that was made between Judge King and counsel as to what the government's arguing in this case, we're not arguing for the court to change the law. Certainly we recognize that a three-judge panel can't change an en banc decision. What we would like the court to do is to apply the law as it's been written and recognize that within the spectrum of harm that an asylum applicant can allege, not all of it equates to the level of persecution. And that's certainly what we're contending here with respect to the single death threat in the first incident outside the church. Now, it's true, as Judge King points out, that there were two subsequent death threats and you made an allusion to federal rule of evidence 404B, but as counsel pointed out, the rules of evidence don't apply. And for a very important reason in this case is that for an act to constitute persecution, it has to have a nexus to a protected ground. And as the immigration judge correctly found with respect to the other three incidents of threats, the religion of the respondent, the petitioner's religion played no part in that whatsoever. They had other motives. The one threat was directed towards retaliation for reporting the crime, the robbery to the police. The threats incurred in the robbery were motivated by pecuniary interest and so on. So you can't, you know, the immigration judge was correct in looking at the death threat, which for the sake of argument may have been the most severe form of harm here, and analyzing that particular incident as whether it constituted past persecution. But there were three death threats. Excuse me? You said the death threat. There were three death threats. Only one of them had a nexus to a protected ground. Well, she didn't go back to church. She didn't wear the cross. They didn't have to threaten her about going to church or wearing the cross. The next month or the month after that, she hadn't gone back to church. She said, I didn't go back. They said, if you go back to church or wear the cross, we'll kill you. And she complied. She complied. Then one begs the question, why did they continue to threaten her? If she stopped going to church, did they have a continuing persecutory motive? And that's exactly the point here. That's exactly why the immigration judge didn't look at those other three, because they made no mention of her church. I thought it was, at least from the counsel's side, that when it made in terms of the value, wanted to change value, and I assume there's a connection being made between one who is religious and goes to church and wears a crucifix, that they would have certain values, among which they're not going to just up and go and live with the gang leader and engage in a nefarious relationship with him. And it appears as though there's some incident, at least where they try to kiss her and indicate that they want her to come stay with them, that that would indicate if we can get rid of her devotion in terms of religion, then that would serve the purpose. I'm not sure in terms of why would they want to accost her in the first instance, even before the robbery and retaliation for telling the police, but there seems to be something else there. And the question is, does the whole record support that? Now, there is something else there, and there's no evidence that it's religion. There's no compelling evidence of any persecutory motive with respect to those subsequent threats. So that's why the immigration judge correctly looked at that one threat. Now, to get back to where I began, I used to argue that when I was defending people in criminal cases, that should keep out the similar act evidence. The judge never found a judge that would buy into it. The reason is because I would come up here in the Fourth Circuit, and they wouldn't buy into it either. I'm sorry I didn't mean to interrupt you, Your Honor, but the reason is— I plowed this furrow a few times myself from both sides. So, as I was saying— And you say the evidence rules don't apply. I certainly give some advice to administrative law judges about what to consider and how to deal with evidence. I can't believe that the government would say the evidence rules don't apply. For sure. They may not be completely applicable, but if you've got a question about some evidence, you refer to things like that. So that's where the law is. Your Honor, if I may point the court to the law, the law is immigration law. It's civil immigration law. But these hearings are hearings. It's different from criminal law, and the burden is on the— Well, they are different than criminal law. And they're different than court. They're not court proceedings, but they're administrative law proceedings. I understand Your Honor's position, but the case before us now is— And this is the Attorney General of the United States that you're speaking for. And he's the one that they're working for, too, the prosecutors. Yes, Your Honor. As I was saying, this is a civil immigration case. The burden of proof is different. But why are you up here arguing that we want to change— we should be changing the death threat law? I'm not arguing that, Your Honor. Yes, you are in your brief. Well, to the extent that we said that in my brief, I'm clarifying. And I'm here to say— So you're clarifying now. Go ahead. That the spectrum of harm— That's a good idea. The spectrum of harm involved in analyzing a persecution goes from one end to the other. There are levels of severity that the immigration judges and courts have analyzed and recognized. And that in this case, a single death threat is not sufficiently severe to constitute past persecution. And that death threat— We're going to kill you. That's not enough, according to the Attorney General of the United States. In this case, no. That's what we're arguing, Your Honor, because in the other cases where this court has found death threats to constitute persecution, there were other factors which increased the severity of the threat. In Hernandez-Avalos, there were murders that preceded the death threats, showing that the death threats were credible. In Bedoya, there was a murder that preceded the death threats. Your immigration judge found her credible. He credited everything she said. Exactly. So what I said was what she said and what the judge said is the fact. That's the fact of this case. It's not anything that you can impeach or question the validity of. It's this case. And the only thing you all argue, well, he didn't kill her. It didn't come to fruition. And maybe that proves it wasn't valid in your brief, which is disjointed. That's not really the point that we're making, Your Honor. It's off the wall. It must not be a valid death threat because he didn't kill her and her son, the 5-year-old boy. The immigration judge made the finding a fact based on her assertion. He credited her assertion. He credited that statement that I just gave you. That doesn't end the immigration. Which makes that the facts of the case. The immigration judge is required to analyze the facts under applicable asylum law and come to a determination as to whether that event constituted persecution. What would have had to happen? What would be needed to satisfy past persecution in this case? Well, for example, if there had been a credible death threat that had been carried out, such as in Bedoya, if they had held a gun to her head multiple times, as this court recognized in Hernandez-Avalos, other things. But just a single verbal death, or if there had been more death threats related to religion, multiple death threats related to religion. Those are the factors that would have tipped the scales. So what we're arguing here is not that the court should change the law. The court should apply the law as it has and other courts have done with respect to measuring and analyzing the extent of harm to determine whether it constitutes persecution. And one other thing I'd like the court to take notice of is the words of the petitioner herself on page 103 of the record. She was asked, what are you afraid of from the gangs in the future? And she said, I'm afraid that they're going to kill me in retaliation for reporting to the police. This was her chance. This is her evidence out of her sworn testimony as to how she perceived the harm that she faces. It had nothing to do with religion. It all had to do with retaliation and other criminal motives, which this court has held and other courts have held doesn't constitute a persecutory motive. So to sum up, if there's no more questions from the panel, we would like to emphasize that there exists a range of harm that the court has to analyze. And the mere fact that it was a death threat doesn't end the inquiry. The court, as was the immigration judge, is still obligated to assess whether that harm rises to the level of persecution. So a death threat is, you want us to rule it, a death threat is not enough to establish persecution. Death threat, full stop, with nothing else, in this case, in this case, is not persecution. And you said that would be, we would still be consistent with our precedent. Yes, because the precedent involves analyzing the spectrum and level of harm, severity of harm, and so forth. And that is black letter law in asylum since the statute was. Is there any, if we were to grant some relief to the petitioner here, is there any distinction that could be drawn between the three claims? Or is it a package deal? I'm not sure I follow your question. Well, we have three claims, I think. Asylum and CAD claims. Well, I think that CAD, I don't think that the petitioner. Well, there's three of them. There are three of them on appeal here. Three claims. I'll ask him that, too. Well, as I understand it. I'm not trying to crap you on anything. I just wondered if it's a package or if it's up and down on all three or whether we pick and choose. If the court grants asylum, then withholding of removal is obviated. There's no need to consider withholding of removal. Convention against torture protection is different. Convention against torture protection requires a clear probability of torture untethered to any nexus. It doesn't have to be on account of anything. As I understand it, and perhaps counsel can clarify, I don't know if CAD was. I'm not confusing this with another case. I don't think in this case that CAD was preserved. So you're saying the CAD claim may not be on appeal? Correct. It may not be here. And if I'm mistaken, I apologize. No, no. I don't know either. We've got you fellows here to help us out. Yeah, I've handled a number of cases. You're here to help us. Thank you. So, yes, if the court grants asylum, there's no need to consider withholding. The reason why the court would consider withholding and not asylum is if the petitioner was ineligible for asylum because of a criminal conviction or missing the filing deadline. The differences between the two is that asylum grants legal status, which is a pathway to citizenship, whereas withholding of removal doesn't. The same is true with respect to CAT protection. CAT protection and withholding are mandatory, whereas asylum is discretionary. So that's the essential difference. So there's really, the court need, I think, to make one ruling here, and I think that's asylum. And up or down on that pretty much determines the rest of it. Thank you very much, sir. Thank you very much, Your Honors. Good to have you with us. Mr. McKinney?  Very briefly, I want to point to areas in the administrative record where the asylum seeker declared why she thought she was being subjected to persecution. AR-7475, ma'am, why did you come to the United States? Respondent, well, Respondent and Immigration Court Petitioner here. Because of the church I attend, I was threatened that if I continued going to that church, I would be killed. Two pages later, they just told me that if I went to church, they were going to kill me. Three pages later, that if I returned to church or wore the medal, they would kill me. Then she described her involvement in the church. Twenty pages later, she engaged in a discussion on why she believes that gangs don't like religious people. That's at AR-105-107. Going back to her affidavit, which was years, a couple years before the individual hearing, she said, On February 13, 2016, the same gang members who took my cross off and beat me up and intercepted me and my sister in the street and tried to force me to kiss them entered my house. Now, my client has very little education, and frankly, this declaration doesn't have the best syntax. But what she's clearly doing here is tying this up in its totality. Incident one, gang members took off her cross, beat her up, threatened her with death. Incident two, intercepted the asylum seeker and her sister in the street and tried to sexually assault them, forcing a kiss on them. Number three, a violent home invasion. This is crystal clear. It checks every box of the asylum statute, but it speaks volumes to the government's continuing resistance to what is now the well, well established precedent of this court. Let me ask you something, Mr. McKinney. Why is it you all wanted to bail out on your client? You wanted to withdraw from the case and not have it argued. I don't understand how you could do that. No, I think that's entirely fair. And actually, we have finally made contact with our client. I'm not talking about whether you're in contact or not. It's not our problem. They don't have to be here for a pellet argument anyway. But that's between you and the client. But you wanted to withdraw from the case. You wanted to withdraw. I always thought lawyers take on a case, they stick with it. I completely agree with that, Your Honor. Maybe you haven't. If they have a problem with getting paid, that's between you and the client. It's not for us. Absolutely. I completely agree with that. I had an old judge out there in West Virginia who used to talk about the missing witness, Mr. Green. These lawyers always come in and ask for continuances and withdrawal because they couldn't find the witness. And we called that the missing witness motion. And the judges would deny it. But you came in and asked us at the last moment to get out of the case, to withdraw from this 20-year-old woman and her son's case. I didn't think much of that. I apologize for that, Judge King. If you would permit me to explain. A lot of these cases, especially at this moment in our history, are resolved by having an open line of communication with the government and often able to find resolution. Now, I could not find my client to even discuss a strategy with her. At that point, I felt that I was acting. I did not want to. But you're a very able lawyer. You could figure out the strategy. She wasn't going to be able to help you much. A 20-year-old woman from El Salvador. I don't think she'd be expected to strategize for an argument in a United States Court of Appeals. She's relying on you, and you're a good lawyer. Thank you, Judge King. Look, I don't want to send the wrong message to this court. I've built my career on helping people like Ms. Soto-Guzman. It's not about fees. It's not about the money. It was about my ethics not being able to even locate my client or know where she was to even talk about the case that led me to make three motions, not just one. They were all the alternative. Correct, correct, just to be fair. But with that said, we made contact with her by email yesterday, and we're getting back on track. And thankfully, the court denied the motions. I'm happy to be here. Thank you for your time. I appreciate your work, and I appreciate your help. And you also, Mr. Fiorino, and I apologize for mispronouncing your name. I've done that a lot over the years, mispronouncing all your names. I've done a lot of apologizing for that. But anyway, and if we would do so, we'd like to come to the well of the court and shake your hands in tradition of the Fourth Circuit and tell you you did a good job. So we'll just tell you that from the bench. And hopefully you'll be back, and things will change by then, and we'll shake hands with you then. Thank you very much, and all the best to both of you.
judges: Robert B. King, James Andrew Wynn, Henry F. Floyd